**In the Matter of J. J. BRADLEY & CO., INC., Debtor.**

**Bankruptcy No. 180–00430–16.**

United States Bankruptcy Court, E. D. New York.

Oct. 7, 1980.

---

Robert P. Herzog, New York City, for the Trustee, for the Motion.

Robert L. Kassel, New York City, In Opposition; Anthony V. Labozzetta, New York City, of counsel.

MANUEL J. PRICE, Bankruptcy Judge.

This is a motion, made by the trustee of J. J. Bradley and Co., Inc. (THE DEBTOR), pursuant to Section 329(b) of the Bankruptcy Reform Act of 1978 (THE CODE), 11 U.S.C. § 329(b), to examine the reasonableness of the fee, in the sum of $25,000, paid by it to its attorney, the firm of Robert L. Kassel, Esq. (KASSEL), on January 22, 1980, one week before it filed a voluntary petition for relief on the debtor's behalf in this court pursuant to Subchapter III of Chapter 7 of the Code, 11 U.S.C. § 741 *et seq.*; to determine "the proper, reasonable amount which should have been paid" and directing "that the excess above said reasonable amount be held invalid and recovered" by the trustee for the benefit of the estate (Notice of Motion dated March 5, 1980). The motion was set for hearing before me on April 10, 1980 at which Robert L. Herzog, Esq., appeared for the trustee; Anthony V. Labozzetta, Esq., a member of the Kassel firm, appeared for it and Norman L. Steinberg (STEINBERG) and Louis Teitelbaum (TEITELBAUM), the president and vice-president, respectively, of the debtor testified.

The following is a short resumé of the facts:

The debtor, which had been in business for about two and a half years, had been a broker dealer in municipal bonds with offices in Queens, New York. Steinberg and Teitelbaum had each owned 50% of its issued and outstanding shares. Its business had consisted of buying and selling municipal bonds for its own account (Transcript, p. 5, 1.2–p. 6, 1.23). In August or September, 1979, due to the increase in interest rates, it ran into financial problems serious enough to require consultation with legal counsel (Transcript, p. 11, 1.21–p. 12, 1.9). Other

contributing factors to its difficulties were the general decline in the municipal bond market and losses incurred by a joint venture in which it was engaged with the Huntington National Bank of Columbus, Ohio (HUNTINGTON BANK) which is listed in Schedule A–3 of its petition for relief as a disputed creditor in the amount of $9,000. The debtor encountered some difficulty in obtaining legal representation. However, on the recommendation of its accountant, it communicated with Kassel sometime in December, 1979 (Transcript, p. 21, 1.25–p. 22, 1.9). By that time it would appear that Steinberg and Teitelbaum were anticipating problems with the National Association of Securities Dealers (N.A.S.D.) and the Securities and Exchange Commission (S.E.C.) by reason of having failed to file certain financial reports on behalf of the debtor.

On January 4, 1980, a retention agreement was entered into among the debtor, Steinberg and Teitelbaum and the Kassel firm (Trustee's Exhibit 3) which reads as follows:

"Robert L. Kassel
Counsellor at Law
280 Park Avenue
New York, N.Y. 10017

January 4, 1980

J. J. Bradley & Co., Inc.
Mr. Norman Steinberg
Mr. Louis Teitlebaum (*sic*)
93–14 Queens Boulevard
Rego Park, New York 11373

Gentlemen:

Pursuant to our discussions over the last several days, this firm agrees to represent J. J. Bradley & Co., Inc. and its principals, Norman Steinberg and Louis Teitlebaum (*sic*) in connection with the following matters:

A) To make a general assessment of the capital structure of J. J. Bradley & Co., Inc.

B) To analyze all outstanding securities transactions.

C) To review the company's financial filings with the Securities and Exchange Commission and the National Association of Securities Dealers.

D) To review the firms (*sic*) disclosure requirements with the aforementioned agencies with regard to a joint account with Hintington (*sic*) National Bank of Columbus, Ohio and certain when–issued transactions.

E) To investigate the feasibility of obtaining additional capital and/or subordinated loans for J. J. Bradley & Co., Inc.

We agree to render such services as may be necessary to properly analyze the above matters and such other matters as may arise during the course of our services.

You shall pay our firm on an hourly basis as follows: Robert L. Kassel–$165.00 per hour; Anthony V. Labozzetta–$125.00 per hour; and Philip R. Brookmeyer–$75.00 per hour. We shall render billing on a monthly basis, or as feasible.

Should any matters arise with respect to which legal services are necessary and which we have not previously discussed, we will bring them to your attention and obtain your consent prior to performing any work thereon.

Very truly yours,

(signed) Anthony V. Labozzetta

ANTHONY V. LABOZZETTA

AVL:plp

AGREED TO:

J. J. BRADLEY & CO., INC.

By: (signed) Norman Steinberg
NORMAN STEINBERG

By: (signed) Louis Teitelbaum
LOUIS TEITLEBAUM (sic)"

Twenty–four days later, on January 28, 1980, the debtor executed its petition for relief which was filed in this court on the next day. It had been prepared and filed by Kassel. In the meantime, on January 22, 1980, the debtor issued two checks to the order of Robert L. Kassel, Esq., totaling $25,000. One, number 1238, was for $14,000 (Trustee's Exhibit 1), and the other, number 1239, was for $11,000 (Trustee's Exhibit 2).

It is this payment of $25,000 which is referred to in the Statement pursuant to Rule 219(b) of the Rules of Bankruptcy Procedure executed by Kassel on January 28, 1980 and attached to the petition for relief. It reads as follows:

"The undersigned, pursuant to Rule 219(b), Rules of Bankruptcy Procedure, states that the compensation paid or promised by the debtor(s), to the undersigned, is as follows:

For legal services rendered (including spouse if both file), Bankrupt agrees to pay _____$25,000. Prior to the filing of this Statement, Debtor (and spouse if applicable) has paid the undersigned _____$25,000.00 Balance due _____ 0

The filing fee has been paid.

The services rendered or to be rendered include the following:

(a) Analysis of the financial situation, and rendering advice and assistance to the client in determining whether to file a petition under title 11, United States Code.

(b) Preparation and filing of the petition, schedules of assets and liabilities, and statement of affairs.

(c) Representation of the client at the first meeting of creditors.

The undersigned further states that the source of monies paid by the Bankrupt(s) to the undersigned was and is, earnings, wages and compensation for services performed, and

The undersigned further states that the source of monies paid by the Debtor(s) to the undersigned was and is, earnings, wages and compensation for services performed, and

Dated: January 28, 1980

Respectfully submitted,

(Signed) Robert L. Kassel
Attorney for Petitioner
Robert L. Kassel, Esq.,
280 Park Avenue,
New York, New York 10017"

In the affidavit submitted by Kassel in opposition to the motion, verified by him on March 31, 1980, he alleges that:

"5...The actual bankruptcy represent (sic) only about 20% of the overall time and charges that have already and will continue to be spent on the legal issues involved."

\* \* \* \* \* \*

"8. The statement pursuant to Rule 219(b) filed along with the petition in bankruptcy (sic) reflects the total fee paid but erroneously describes the fee as paid solely in connection with the bankruptcy. This is inaccurate and was merely an oversight on our part."

The affidavit has attached to it a statement of services purportedly rendered by his firm on a daily basis and the time which it claims was spent in their performance. In it, Kassel claims that from January 4, 1980, the date of the retention of his firm, to March 27, 1980, it had spent 207.2 hours on the Bradley matter. In its Memorandum of Law and in its daily time records, the services are broken down into three time periods. The first, from January 4, to January 22, lists approximately 145 hours of alleged services before the petition for relief was filed (Time Records, paragraphs 1–12). The second, from January 23 through January 29, lists approximately 20 hours allegedly spent deciding to file a petition for relief and actually preparing it (Time Records, paragraphs 13–15). The third, from January 30 to March 27, 1980, lists approximately 40 hours of alleged post–petition work (Time Records, paragraphs 16–28).

As has heretofore been pointed out, Kassel had received two checks from the debtor on January 22, 1980, one for $14,000 and the other for $11,000. Anthony V. Labozzetta (LABOZZETTA), who argued in opposition to this motion for the Kassel firm, and who, along with Kassel and Phillip R. Brookmeyer (BROOKMEYER), worked on the matter, characterized these payments in the following manner. The $14,000 check was paid to the firm as compensation for the 145 hours of pre–petition work. $5,000 of the second check of $11,000 was compensation for filing the petition for relief. The

remaining $6,000 of the $11,000 check was compensation, paid in advance, for anticipated post–petition work (Transcript, p. 83, 1.2–p. 84, 1.2).

Section 329 of the Code provides that:

"(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered *in contemplation of and in connection with the case* by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive ...." (emphasis added).

Section 329, subdivision (a) is derived from Rule 219(b) of the Rules of Bankruptcy Procedure (THE RULES), while Section 329, subdivision (b) had its origin in Rule 220 which had superseded Section 60(d) of the Bankruptcy Act of 1898, as amended (THE ACT) and are substantially similar to those provisions. *See* 2 Collier on Bankruptcy (15th Ed.), ¶ 329.02, pp. 329–3–329–5.

Kassel first contends that, except for the $5,000 paid for the filing of the petition for relief, the fee was not for services "rendered in contemplation of and in connection with the [bankruptcy] case", as required by Section 329. The preliminary question to be decided therefore is whether bankruptcy was contemplated on January 4, 1980 when his firm was retained.

It argues that it "was not initially retained to commence a bankruptcy proceeding, but rather to maintain J.J. Bradley and Co., Inc. as a viable entity" (Kassel Memorandum, p. 6), and that the debtor was solvent on January 4, 1980. Let us examine its financial condition on that date. Steinberg, the president and 50% shareholder of the debtor testified that, as early as August

or September, 1979, it was experiencing financial difficulties sufficiently serious to impel it to seek legal counsel (Transcript, p. 11, 1.21–p. 12, 1.9). One of its difficulties was the joint venture to buy bonds which it had entered into with Huntington Bank in July, 1979 (Transcript, p. 13, 1.19–p. 20, 1.24). The venture lost money, and Teitelbaum, the debtor's vice–president and other 50% shareholder, had to lend it $20,000 to pay to the Huntington Bank (Transcript, p. 19, 1.23–p. 20, 1.2). The debtor's Schedule A–3 lists Teitelbaum as a creditor for $20,000 by reason of a loan, presumably this one, on October 15, 1979. Despite this infusion of $20,000 into the joint venture, the Huntington Bank is listed as a disputed creditor in the amount of $9,000 in Schedule A–3. It thus appears that, at least so far as the Huntington Bank is concerned, the debtor has never produced funds sufficient to cover the losses incurred by the joint venture. Clearly, in October, 1979, when Teitelbaum made the $20,000 loan, the debtor was not generating sufficient cash to cover the losses incurred by it in the joint venture.

There is nothing in the record to lead me to believe that from August or September of 1979, when the debtor's financial problems became serious enough for it to seek counsel, until January 29, 1980, the date of the filing of the petition, its financial condition never improved. With respect to the question of when the debtor actually became insolvent, Kassel contends, and Teitelbaum testified, that on January 4, 1980, the date of the retention agreement, the debtor was not yet insolvent (Transcript, p. 58, 11.2–5). It was argued by Labozzetta at the hearing that a severe dip in the bond market in January, 1980, caused it to lose money on certain executory contracts listed in the "Statement of Executory Contracts" signed and sworn to by the debtor attached to the petition and it thus became insolvent by January 29, when the petition was filed (Transcript, p. 53, 1.17–p. 54, 1.9). According to these statements by counsel, whether or not the debtor was technically insolvent on January 4, 1980, its very existence de-

pended on the vagaries of the bond market. What was the alternative if the market fell? Obviously it was insolvency and liquidation. It is clear from these statements that the debtor had virtually no cash on January 4 to cover any losses; either the bond market went up, or it was out of business.

Labozzetta also made this statement at the hearing: "This was not a question of a firm that was insolvent when it first sort (*sic*) advice. It was *potentially solvent* but needed more working capital." (Transcript, p. 54, 11.3–6) (emphasis added). Counsel here takes the anomalous position that, when the debtor sought advice, it was neither solvent nor insolvent, opting instead to characterize its financial status at that time as "potential solvency" pending the acquisition of additional working capital. Again, whether or not it was technically insolvent on January 4, 1980, it is clear from the above quotation that its counsel was of the opinion that it *could* achieve solvency if working capital could be acquired. It can easily by inferred, then, that the alternative, if working capital could not be obtained, was insolvency and liquidation. It should be borne in mind that counsel was describing a point in time when it had already been in financial difficulty for approximately five months, and was twenty–four days away from filing its petition. Clearly, then, on January 4, 1980, when the Kassel firm was retained, the debtor was, and had been for some time, in severe financial straits, and I so find.

The leading case on the issue of when payments are made in contemplation of bankruptcy is *Conrad, Rubin & Lesser v. Pender*, 289 U.S. 472, 53 S.Ct. 703, 77 L.Ed. 1327 (1933). In that case, the recipient of the fee being examined argued that when the fee was received, twelve days before the filing of the petition in bankruptcy, "the most extreme course which was within the contemplation of himself . . . and the bankrupt's president, was continuance of the business under an equity receivership . . .", and not bankruptcy. That debtor, like the one at bar, at the time of retention of the attorney, was experiencing financial difficulty, and questions concerning its viability were being raised. The court reasoned, and concluded, as follows:

"In the exercise of jurisdiction, all questions bearing upon the reasonableness of the transaction, including the purpose and nature of the services, are open to consideration. But it is insisted, in the instant case, that the payment to appellants could not properly be regarded as made in contemplation of bankruptcy, and hence within the jurisdiction to reexamine, because the payment was for the purpose of engaging appellants to conduct negotiations with creditors in order to arrange for an extension of time, and, if necessary, for the operation of the business under the creditors' supervision, and thus to avoid a forced liquidation and ultimately to restore the business to a sound basis. We find no ground for saying that the fact that such purposes were in view establishes, as a matter of law, that the payment was not in contemplation of bankruptcy. On the contrary, negotiations to prevent bankruptcy may demonstrate that the thought of bankruptcy was the impelling cause of the payment. 'A man is usually very much in contemplation of a result which he employs counsel to avoid.'" (citations omitted).

289 U.S. at 478–79, 53 S.Ct. at 705.

Both principals of the debtor testified that, although they did not retain the Kassel firm for the sole and specific purpose of filing a petition in bankruptcy, they were impelled by their concern for the continued viability of their company. Thus, Steinberg testified as follows:

"Q Mr. Steinberg, when you first came to our office was it your intention to file a petition in bankruptcy? By your intention, I mean the intention of the firm?

"A No, it was the intention in speaking to a lawyer, it was to establish the clarification and where we were at *and the viability of where we could go.*

"Q And did we immediately advise you to file a petition in bankruptcy?

"A No.

(Transcript, p. 48, 11.7–16) (emphasis added). Steinberg here states, upon examination by his own counsel, that his intention in retaining that counsel was to determine the future viability of his firm.

Teitelbaum testified as follows:

"Q And do you recall what the purpose was in your retaining counsel in early January?

"A To petition our firm on the street *for access (sic) and or merger and to petition private individuals for subordinated capital and in addition to that, what exactly our financial position was such that we could possible (sic) petition friends and relatives for additional finances in addition to the other two categories.*"

(Transcript, p. 57, 11.3–10) (emphasis mine).

The testimony of Steinberg and Teitelbaum establishes that, when the Kassel firm was retained, they were, at the very least, concerned about the "viability" of their company. Furthermore, one of the purposes of Kassel's retention, as stated in the retention agreement, was "[t]o investigate the feasibility of obtaining additional capital and/or subordinated loans for J.J. Bradley & Co., Inc." Teitelbaum testified that part of Kassel's work was to look into the possibility of a merger with another brokerage firm; the acquisition of the debtor by some other firm or possibly obtaining sources for additional capital. (Transcript, p. 57, 11.3–10). It is evident that both Steinberg and Teitelbaum knew that their business could not continue without either a merger, a takeover, or the infusion of additional capital. This case thus falls squarely within the rule of *Conrad, Rubin & Lesser v. Pender, supra*. From the very outset of Kassel's retention, efforts began to "restore the business to a sound basis", including "negotiations to prevent bankruptcy", such as those involving possible mergers or capital sources. *Id.*

Furthermore, there is contradictory evidence in the record as to precisely when the decision to file the petition for relief was reached. Teitelbaum initially testified that the filing of a petition for relief was first "considered . . . as a viable alternative" on approximately January 28. He then stated that it may have been "[s]omewhere within that week preceeding (*sic*) the 28th of January." (Transcript, p. 58, 11.15–22). In the time records accompanying the Kassel firm's answering affidavit, however, it is stated that on January *23*, 1980, the decision to file the petition was reached, yet the check for $11,000 which represented payment of the fee therefor was dated January *22*. Steinberg testified that the decision to file the bankruptcy petition was reached "a couple of weeks at least . . ." before January 28. (Transcript, p. 24, 1.18–p. 25, 1.2). This would place the decision to file the petition less than two weeks after the Kassel firm's retention. With respect to this issue, the trustee read the following testimony of Steinberg from the meeting of creditors held pursuant to Section 341 of the Code, 11 U.S.C. § 341, into the record:

"QUESTION: When did you first consult with an attorney with reference to the filing of the petition?

"ANSWER: *I'm not sure the exact time but I would say the beginning of January.*

"QUESTION: Of 1980?

"ANSWER: *Yes. In the early part of January.*"

(Transcript, p. 12, 11.14–21) (emphasis added). This testimony places the decision to file the petition at about the same time as the Kassel firm's retention.

To summarize, on January 4, 1980, the debtor had been in financial straits for approximately four or five months and had had to borrow $20,000 from one of its principals in order to cover losses sustained in the Huntington Bank joint venture. Its principals were clearly concerned about the financial viability of the firm; indeed, in light of the evidence, they had reason to be. Steinberg testified at the first meeting of creditors that consultation with the Kassel firm regarding filing a petition for relief

occurred in "the beginning of January". The petition was executed on January 28, 1980, a mere 24 days after its retention. Whether the debtor was already insolvent in 1979 or did not become insolvent until the morning of January 28, 1980 is of little importance in light .of these facts. By the beginning of January it was evident to Steinberg and Teitelbaum that the debtor could not continue in business without the infusion of new capital. Thus, as heretofore stated, the case falls squarely within the rule enunciated by *Conrad, Rubin and Lesser v. Pender, supra*, and I find that under Section 329 of the Code, the debtor contemplated bankruptcy in retaining the Kassel firm on January 4, 1980.

Having found that bankruptcy was contemplated, it remains to be determined whether the fee paid to the Kassel firm was reasonable. Section 329(b) of the Code provides that any compensation exceeding the reasonable value of the services rendered should be turned over to the trustee. Section 330 of the Code provides that:

"(a) After notice to any parties in interest ... and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

"(1) *reasonable compensation for actual, necessary services rendered* by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, *based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title* ; and

"(2) reimbursement for actual, necessary expenses." (emphasis added).

What are the criteria to be used in determining the reasonable compensation to be paid to Kassel for its services to the debtor? In the case of *In re Paramount Merrick, Inc.*, 252 F.2d 482 (2d Cir. 1958) the court stated, at page 485:

"The principal factors which entered into a determination of what is reasonable are the time spent, the intricacy of the questions involved, the size of the estate, the opposition encountered, the results obtained ... "

I shall first consider the compensation paid to Kassel by the debtor for work allegedly performed up to and including the filing of the petition for relief.

To begin, I note that it is clear from the record that the affairs of the debtor were not extensive. The Statement of Executory Contracts attached to the petition reveals a total of seven. Beyond these, Teitelbaum testified that during the weeks preceding the filing of the petition, six other open bond transactions were settled (Transcript, p. 61, 1.8–p. 62, 1.6). Furthermore, not including its two principals, the petition reveals that the debtor had a total of eleven creditors with claims totaling $225,763.21. $201,000 of this, however, is owed to the one secured creditor, Security Processing Systems. Most of the other creditors have routine claims for relatively small amounts. The only debt which is disputed is the $9,000 owed to the Huntington Bank. The B Schedules show no real property, and $251,882.63 in personal property owned by it. Most of this, however, is in the form of "300,000 New York State Dormitory Authority City University C Series Bonds" valued at $241,000. Clearly, then, its affairs were neither complicated nor extensive.

The Kassel firm, nevertheless, alleges that roughly 165 hours were spent on this case through the filing of the petition, at a cost of approximately $19,000. Let us examine the nature of, and justification for, this alleged monumental effort, and like fee.

An examination of the descriptions accompanying the daily time records of the 145 hours of work performed before the petition was prepared and filed reveals that a large amount of time was spent by the Kassel firm familiarizing itself with the affairs of the debtor. On January 4, 1980, both Kassel and Labozzetta met with Stein-

berg and Teitelbaum for seven hours, fourteen billable hours, "regarding general corporate structure of J.J. Bradley and Co., Inc., nature of business, outstanding transactions, bank accounts and clearing lines, capital structure, etc." (Time Records, ¶ 1). Considering the foregoing description of the extent of the debtor's affairs, this lengthy meeting should have been more than sufficient for the Kassel firm to familiarize itself with all of them. Yet on January 7, Kassel and Labozzetta again met with Steinberg and Teitelbaum for five and one-half hours, eleven billable hours, "regarding subordinated loan agreements ... outstanding transactions including prices, settlement dates, nature of issues and assessment of bond market." (Time Records, ¶ 2). On this same day, Kassel, who supposedly had this five and one-half hour meeting, also allegedly spent seven hours having telephone conferences with Peter Amsterdam, the debtor's financial officer. No description of the purpose or substance of these conferences is given (*Id.*). On the following day, Kassel allegedly had a three hour telephone conference with Steinberg "regarding *availability* of corporate records." (Time records, ¶ 3, emphasis mine). On January 8–10, the firm expended an additional *twenty–six hours* duplicating these efforts which, in my opinion, should have been completed at the seven hour meeting held on January 4 (Time records, ¶¶ 3–5).

During January 10–12, the Kassel firm, which "specializ[es] in securities law" (Kassel's affidavit, ¶ 9; Transcript, p. 76, 1.23–p. 78, 1.10), spent twenty–three and one–half hours conducting a "[r]eview of NASD and SEC regulations regarding disclosure requirements applicable to joint purchase accounts and when issued transactions. Analysis of Rule 15 of Securities Act of 1933 as applicable to company. Analysis of firms (*sic*) legal position on outstanding transactions." (Time records, ¶ 5).

On January 14, the repetitious reviewing of the debtor's affairs resumed, and from January 14 through January 19, by my calculation, approximately twenty–six more hours were spent in reviewing its affairs (Time records, ¶¶ 6–10). But the Kassel firm was still not finished with this task, and on January 21, thirteen more hours were spent in a "continued review of books and records and evaluation firm open positions (*sic*)."

After all of this supposed time and effort spent in examining the debtor's affairs, analyzing its books and familiarizing itself with its financial transactions, Kassel should have been able to prepare the petition for relief in a minimal amount of time. All that remained to be done was to buy a set of printed forms from any legal stationer and to fill in the petition, schedules, statement of affairs, statement of executory contracts and statement pursuant to Rule 219(b) with the information which it had already obtained from the debtor. However, according to the time records, Kassel purportedly spent six hours, Labozzetta supposedly spent six and a half hours and Brookmeyer claims to have spent seven hours for a total of nineteen and a half hours preparing them (¶¶ 13–15).

■ It is obvious to me that the services purportedly rendered and the time supposedly spent on this matter by the Kassel firm through the filing of the petition which are enumerated in the time records are grossly exaggerated in order to justify the fee of $19,000 which was charged and paid by the debtor on the eve of bankruptcy.

■ In addition to $19,000, Kassel was paid an additional $6,000 for services to be rendered by it after the petition was filed. According to the 219(b) statement signed by Kassel, it was to represent the debtor "at the first meeting of creditors." Under Section 343 of the Code, 11 U.S.C. § 343:

"The debtor shall appear and submit to examination under oath at the meeting of creditors under section 341(a) of this title. Creditors, any indenture trustee, or any trustee or examiner in the case may examine the debtor."

The Kassel firm appeared with the debtor's officers at the meeting of creditors and represented it during their examination. According to paragraph 23 of the time records, Brookmeyer spent one hour on these

services. According to paragraph twenty-two, Labozzetta spent two hours conferring with the trustee, by telephone, concerning this case. These services, which took three hours, are compensable. *In re Evenod Perfumer, Inc.*, 67 F.2d 878, 879 (2d Cir. 1933) *cert. denied* 291 U.S. 671, 54 S.Ct. 455, 78 L.Ed. 1060 (1934).

■ The remainder of the Kassel firm's post–petition work involved meetings and discussions with the N.A.S.D. and the S.E.C. These services are not compensable. Almost immediately after the petition was filed, an interim trustee was appointed pursuant to Section 701 of the Code, 11 U.S.C. § 701. After the meeting of creditors held pursuant to Section 341, he became the trustee pursuant to Section 702(d). Pursuant to Section 323, when the tentative trustee was appointed, he became the representative of the estate whose duties were outlined in Section 704.

It is thus apparent that after the petition was filed, it became the responsibility of the trustee to deal with any action by the N.A.S.D. or the S.E.C. against the debtor. The Kassel firm could become involved only if the trustee decided to retain it as special counsel in connection with any such proceedings. The Kassel firm clearly recognized this at the hearing (Transcript, p. 69).

■ Moreover, it would appear that any action brought by the N.A.S.D. against the debtor after the petition was filed would be stayed under Section 362(a), 11 U.S.C. § 362(a), the automatic stay provision of the Code. The Kassel firm argued at the hearing that N.A.S.D. action would not be stayed due to subsection b of Section 362, which provides that "[t]he filing of a petition ... does not operate as a stay–(4) ... of the commencement of continuation of an action or proceeding by a *governmental unit* to enforce such *governmental unit's police or regulatory* power ...." (emphasis mine). Although the N.A.S.D. is not a government agency, the Kassel firm contends that it should be treated as such for purposes of this subsection because it works closely with the S.E.C. In view of the fact that the legislative history urges a narrow

construction of this provision (124 Cong. Rec.H. 11,092 (Sept. 28, 1978); S. 17,409 (Oct. 6, 1978)), I would have stayed any N.A.S.D. proceeding since it is a private organization of securities dealers. In any event, there is no evidence before me that N.A.S.D. ever attempted to commence any sort of a proceeding against the debtor and same is true of the S.E.C.

Finally, it is highly unlikely that the N.A.S.D. or the S.E.C. would be concerned with any proceeding against the debtor since it terminated its business affairs as of January 29 and is now being liquidated under the bankruptcy laws.

Who, then, was being represented by the Kassel firm during all those alleged hours of meetings and telephone conversations with the N.A.S.D. between January 30 and March 27, 1980? The opening paragraph of the retention agreement among the debtor, Steinberg and Teitelbaum and Kassel states: "Pursuant to our discussions over the last several days, this firm agrees to represent J.J. Bradley & Co., Inc. *and its principals, Norman Steinberg and Louis Teitelbaum,* in connection with the following matters ...." Trustee's Exhibit 3 (emphasis added). In paragraph 4 of the affidavit submitted by Kassel in opposition to this motion, it is stated that "[n]umerous hours have been spent in order to ascertain the exposure of the company *and its principals* to sanctions at three levels, N.A.S.D., S.E.C. and U.S. Attorney." (emphasis added). At the hearing before me, the following colloquy occurred:

"THE COURT: Are you representing Mr. Titlebaum (*sic*) and Mr. Steinberg individually too?

"MR. LABOZZETTA: We will represent them at the point in which they are named as defendants in any type of a proceeding.

  \*   \*   \*   \*   \*   \*

"THE COURT: What relief can the SEC get from a corporate shell.

"MR. LABOZZETTA: *The only relief that they would seek would be injunctive relief.*

"THE COURT: Companies (*sic*) out of business?

"MR. LABOZZETTA: While it might seem unnecessary, the SEC in my opinion from my experience would proceed against the company in any event, even if it were only *to get at the principals* and get the company's records."

(Transcript, p. 78, 11.11–16; p. 81, 11.3–12 (emphasis added). Labozzetta states that the only relief the S.E.C. would possibly seek is injunctive relief. So far as the debtor is concerned, however, there is no longer any business activity to enjoin. Furthermore, if any such legal problems concerning the debtor could possibly arise, they would be the responsibility of the trustee and not Kassel.

From all of the evidence before me, I must conclude that the fee of $25,000 paid to the Kassel firm for its services to the debtor, both before and after the filing of the petition for relief, is excessive. I have already found that the description of its services and the time spent thereon were grossly exaggerated. But the exaggeration aside, what results did this firm accomplish for the debtor by its expenditure of time and effort? The debtor's basic problem, when it retained Kassel, was that it was undercapitalized and could not continue unless it obtained an infusion of new funds. Nineteen days later, the same condition existed and the determination was made to file the petition. It was held many years ago that:

"It is undoubtedly true that the success or failure of an attorney is an important factor to be considered in determining the value of his services. Success is the test applied by the business world in measuring compensation. It is largely so in the courts. As a rule, professional services, however able or prolonged, which yield no results, command no high reward." *In re Hoffman*, 173 F. 234, 235." (E.D. Wis. 1909)

I have found that the compensable services rendered by Kassel after the filing of the petition were minimal. It is my opinion that the bulk of the fee paid by the debtor through Steinberg and Teitelbaum was meant to cover services rendered and to be rendered to them personally. They were concerned about their responsibility for the joint venture with the Huntington Bank and other transactions for which they had failed to file reports or disclosure statements required by the N.A.S.D. and S.E.C. They have attempted to use the debtor's funds to insulate themselves from their obligation to pay their attorney's fee. Accordingly, I find that the reasonable value of the services rendered by Kassel to the debtor from the date of its retainer through the conclusion of this case, to be $5,000 and it is directed to return the sum of $20,000 to the trustee.

Submit order in conformity herewith.